# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### August 19, 2015 Session

## LEE STACK, III v. JOANN VALERIE STACK

**Appeal from the Chancery Court for Williamson County**
**No. 42697      Walter C. Kurtz, Senior Judge**
_____

**No. M2014-02439-COA-R3-CV- Filed August 4, 2016**
_____

This appeal arises from post-divorce efforts to modify custody and child support established in a Montana divorce. After the divorce, the mother and the child moved to Tennessee. Although the father was living in Montana, he filed a petition to modify parenting time and child support and for other relief in Tennessee. The trial court found a material change in circumstance sufficient to modify the residential parenting schedule and that modification would be in the child's best interest. The trial court also found a significant variance between the Montana child support amount and the amount presumed under the Tennessee Child Support Guidelines and modified the child support order. After reviewing the record, we conclude that the trial court lacked subject matter jurisdiction to modify the Montana custody determination but did have authority to enter a temporary order enforcing visitation. We also find that, although the court had jurisdiction to modify the Montana child support order, the court incorrectly calculated the mother's gross income and failed to credit the father for his payment of the child's health insurance premium. Therefore, we vacate and remand with instructions to dismiss the Father's petition to the extent it seeks modification of the parenting time. To the extent Father seeks to enforce visitation with his child, we affirm the specific visitation schedule ordered by the trial court and remand for the court to set a time for expiration of the temporary visitation schedule. To the extent the petition seeks to modify child support, we vacate and remand for a calculation of child support in accordance with the Tennessee Child Support Guidelines and this opinion.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Chancery Court Vacated in Part; Affirmed in Part; and Case Remanded**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S. and ANDY D. BENNETT, J., joined.

Sarah Richter Perky, Nashville, Tennessee, for the appellant, Lee Stack, III.

Demeka Kay Church, Franklin, Tennessee, for the appellee, Joann Valerie Stack.

**OPINION**

## I. FACTUAL AND PROCEDURAL BACKGROUND

Lee Stack ("Father") and Valerie Stack ("Mother") were divorced in Montana on May 11, 2012. The marriage produced one child, Aden, born in June of 2011. The Montana divorce decree approved and incorporated the parties' settlement agreement and stipulated final parenting plan. These documents provided for the division of marital property, payment of spousal and child support, and parenting of Aden.

The Montana parenting plan designated Mother the primary residential parent. However, the parenting plan did not grant Father specific parenting time. Instead, the parenting plan provided as follows:

> [Father] will have parenting time as mutually agreed upon by the parties. At this time, [Father] does not plan to exercise any parenting time or visitation with [Aden]. If [Father] decides he would like to have parenting time with [Aden] in the future, the parties will revisit this parenting plan at that time, if they are unable to mutually agree on [Father's] parenting time.

The Montana settlement agreement included several provisions pertaining to the financial support of Aden. Father agreed to pay $2,600 per month in child support, an amount in substantial compliance with the Montana Child Support Guidelines. Father also agreed to pay the health insurance premiums for Mother and Aden. The parties agreed to divide pro rata any of Aden's health expenses not covered by insurance. Mother was allowed to claim Aden as a tax exemption each year, with the proviso that if, in any given year, the exemption would not benefit her, Mother would allow Father to use the exemption. Finally, Father agreed to maintain a life insurance policy with a death benefit of $1.5 million, payable to Aden, and a death benefit of $500,000, payable to Mother, for a minimum period of twenty-five years.

On November 25, 2013, Mother filed a petition in the Chancery Court for Williamson County, Tennessee, to register the Montana divorce decree, including the parenting plan. Mother asserted that she had lived in Tennessee with Aden since October 23, 2012. On January 10, 2014, the court entered an agreed order, which registered the Montana decree. The agreed order provided as follows:

2

> As evidenced by the signatures of counsel for the parties below, it is agreed that Case No. DR-11-56 from the Sixth Judicial District Court of Park County, Montana, shall be registered for all purposes in the Chancery Court for Williamson County, Tennessee, and said Court shall retain jurisdiction over said matter in all respects.

Father also filed a copy of the agreed order with the Montana Court.

On January 29, 2014, Father filed a petition in the chancery court to modify the Montana parenting plan and for other relief. Father asked for specific parenting time and telephone contact with Aden, joint decision making, and modification of child support. The court conducted a hearing on the petition over two days, October 9 and 10, 2014.

## A. PROOF AT THE HEARING

### 1. The Parents' Residences and Parenting Time

The testimony at the hearing revealed that, around the time of the divorce, both Mother and Father moved from Montana. In September 2011, Father moved to New Hampshire. A few months after the divorce became final, Mother and Aden moved to North Carolina. In October 2012, however, Mother relocated to Tennessee to be closer to family.

At some point after she moved to Tennessee, Father contacted Mother about exercising parenting time with Aden. Between November 2012 and June 2013, Father began spending time with Aden in Tennessee for a few days every other month. After Father's visit in June 2013, communication between the parties broke down, and they had increasing difficulty scheduling Father's parenting time. While Father had parenting time in August and November 2013, he did not have any parenting time between November 2013 and March 2014.

When Father first began visiting Aden in Tennessee, he stayed in a local hotel, but eventually he purchased land in Spring Hill, Tennessee to build a house. Father testified that while he owned real estate in both Montana and Tennessee, he lived in Montana. Although Father did not state a specific date he moved from New Hampshire back to Montana, at an earlier hearing, he confirmed that he returned to Montana in November 2013.

### 2. The Parents' Work History and Income

During their marriage, neither parent was employed because Father's investments generated sufficient income to meet their needs. Father had an investment portfolio with a value of approximately $2.4 million. He and his sister were also the beneficiaries of four

3

generation-skipping trusts, valued at approximately $4 million.

Because neither party submitted the trust documents as evidence at the hearing, the only proof concerning the operation of the trusts was Father's testimony. Father testified that his distributions from the trusts were at the sole discretion of the trustee, a family friend who also managed Father's investment portfolio. When he needed additional funds, Father submitted a request to the trustee. The trustee had the option of withdrawing the requested funds from either Father's investment account or one of the trusts. Father testified he had no control over the trustee's choice.

As a result of his substantial net worth, Father's tax returns revealed significant, annual income. Father's tax returns for the years 2011 to 2013 showed a total income of $128,361, $116,269, and $147,909, respectively. Father claimed he received relatively small distributions from the trusts. Father's taxable income was comprised of interest and dividend earnings from his investment account and quarterly distributions from the trusts.

Father disclosed that he received additional distributions from the trusts that were not included in his taxable income. Father explained he received $145,000 in 2012 to build a house in New Hampshire and $105,000 in 2013 to buy land in Montana. In both instances, the trustee initially refused his request for trust funds but ultimately approved the distributions. The trustee also paid Father's child support obligations, the health insurance premiums, and the life insurance premiums from trust funds.

Despite not being currently employed, Father was educated and had worked in the past. Father held a college degree in sociology and a personal fitness certification from the American College of Sports Medicine. Previously, he owned health clubs and worked as a personal trainer. He has also worked as a scuba diving instructor and a race car driver. Father claimed he was currently unemployed because his travel time to visit Aden interfered with his ability to obtain employment. While he stated he was offered part-time work in Montana, he provided no details about the job offer.

Mother's financial circumstances were much different than Father's. After the divorce, Mother returned to school and obtained certification as an aesthetician. She worked for five months as an aesthetician in Montana before moving to North Carolina. Since moving to Tennessee, she had applied for a number of jobs but had been unsuccessful in finding employment in her field because of her lack of experience. Mother testified that, for the last year and one-half, she worked part-time as a riding instructor. She testified that she was paid $20 per lesson and an additional amount for trail rides. Although her schedule varied, she generally worked Monday through Thursday between two and eight p.m.

In 2012, Mother's total income, including wages, interest, dividends and capital gains, was $7,501. Mother's 2013 tax return showed a total income of $41,380. While Mother

4

earned only $5,351 as a riding instructor, she reported additional income from interest, dividends, capital gains and a small retirement distribution.

## B. THE CHANCERY COURT'S FINAL ORDER

The court issued its thorough and well-written final order on October 24, 2014. The court found a material change of circumstance had occurred since the Montana divorce in that Father now desired to have a relationship with Aden and the parties were unable to mutually agree on the terms of Father's visitation. The court further found modification of the parenting schedule would be in Aden's best interest. The court awarded Father 90 days of visitation as provided in Mother's proposed parenting plan and granted Mother sole decision making authority with the proviso that she discuss any major decisions with Father.

The court also found a significant variance between the amount of child support ordered by the Montana court, $2,600, and the presumptive amount under the Tennessee Child Support Guidelines, $2,100. The court found Father was voluntarily unemployed and imputed additional income to him based on his potential earnings. The court found Mother was not willfully underemployed. The court declined to order a downward deviation for Father's parenting time travel expenses but determined an upward deviation of $100 per month was reasonably necessary. Therefore, the court set child support at $2,200 per month.

The court made a minor modification to the division of Aden's uninsured medical expenses to provide for the division of only "reasonable" healthcare expenses on a pro rata basis. The court declined to modify the Montana decree with regard to the award of the dependent tax exemption, health insurance, and life insurance. Finally, the court awarded Mother $32,000 in attorney's fees incurred in defending the Montana child support order, as permitted by Tennessee Code Annotated § 36-5-103(c).

In response to the parties' motions to alter or amend, the court issued several clarifying orders. The court declined to make the new child support amount retroactive to the date of Father's petition to modify or to order a hearing on the reasonableness of Mother's attorney's fees.

## II. ANALYSIS

### A. SUBJECT MATTER JURISDICTION

As an initial matter, we must determine whether the trial court had jurisdiction to modify the Montana parenting plan and child support order. Tenn. R. App. P. 13(b); *Toms v. Toms*, 98 S.W.3d 140, 143 (Tenn. 2003) ("Appellate courts must address the issue of subject matter jurisdiction even if the issue is not raised in the trial court."). Without subject matter jurisdiction a court lacks the "power to adjudicate a particular type of controversy," and any

resulting order is void. *Dishmon v. Shelby State Cmty. Coll.*, 15 S.W.3d 477, 480 (Tenn. Ct. App. 1999). "The lack of subject matter jurisdiction is so fundamental that it requires dismissal whenever it is raised and demonstrated." *Id.* "Thus, when an appellate court determines that a trial court lacked subject matter jurisdiction, it must vacate the judgment and dismiss the case without reaching the merits of the appeal." *First American Trust Co. v. Franklin-Murray Dev. Co.*, 59 S.W.3d 135, 141 (Tenn. Ct. App. 2001).

The existence of subject matter jurisdiction depends on "the nature of the cause of action and the relief sought." *Landers v. Jones*, 872 S.W.2d 674, 675 (Tenn. 1994). Here, Father sought to modify both parenting time and child support established in Montana. To determine whether the trial court had jurisdiction to modify the Montana decree, we must examine two statutes, the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), codified at Tennessee Code Annotated §§ 36-6-201 to -243 (2014), and the Uniform Interstate Family Support Act ("UIFSA"), codified at Tennessee Code Annotated §§ 36-5-2201 to -2903 (2014). These laws establish standards for enforcement or modification of child custody and child support orders, respectively, across state lines. *See LeTellier v. LeTellier*, 40 S.W.3d 490, 493 (Tenn. 2001) (discussing the UIFSA); *Staats v. McKinnon*, 206 S.W.3d 532, 544 (Tenn. Ct. App. 2006) (discussing the UCCJEA).

1.  Jurisdiction to Modify the Montana Parenting Plan

Under the UCCJEA, a state making a child-custody determination[1] may retain exclusive, continuing jurisdiction over that determination even if the child has left the state. *See* Tenn. Code Ann. § 36-6-217 cmt. Therefore, the trial court of another state is prohibited from modifying the child-custody determination of another state absent the presence of certain specified circumstances. *See id.* § 36-6-218. One such circumstance is where there is an emergency, which is not the case here. *See id.* §§ 36-6-218, -219. Before considering the applicability of the remaining circumstances, the court where the modification is sought must first determine that it possesses jurisdiction such that it could make an initial custody determination. *Id.* § 36-6-218.

If the court does have the required jurisdiction, the court may modify the child-custody determination of the other state only if one of two events has occurred. *Id.* The first event requires action by the state that made the child-custody determination, and the other event focuses on where the parents and child reside. *Id.* The statute provides as follows:

> [A] court of this state may not modify a child-custody determination made by a court of another state unless a court of

---

[1] The UCCJEA defines "child-custody determination" to include any court order that provides for "the legal custody, physical custody, or visitation with respect to a child." *See* Tenn. Code Ann. § 36-6-205(3). Consequently, the parenting plan adopted by the Montana court constitutes a "child-custody determination."

6

this state has jurisdiction to make an initial determination under § 36-6-216(a)(1) or (2), and:

(1) The court of the other state determines it no longer has exclusive, continuing jurisdiction under § 36-6-217 or that a court of this state would be a more convenient forum under § 36-6-221; or

(2) A court of this state or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state.

*Id.*

The trial court had jurisdiction to make an initial custody determination, satisfying the threshold requirement to the exercise of jurisdiction. By the time Father filed his modification petition, Aden had been living in Tennessee for well over a year. Under the UCCJEA, a Tennessee court has jurisdiction to make an initial custody determination if Tennessee is the child's home state on the date of the commencement of the proceeding. *Id.* § 36-6-216(a)(1). "Home state" means the state in which the child has lived with a parent for at least six months. *Id.* § 36-6-205(7). Having concluded that the trial court had jurisdiction to make an initial custody determination, we then must consider whether the events described in either subsection (1) or (2) of the statute applied such that the trial court could modify the Montana parenting plan. *Id.* § 36-6-218.

The first subsection of the statute was not applicable. We find no proof in the record that the Montana court determined either that its exclusive, continuing jurisdiction had ended or that another state would be a more convenient forum. *Id.* § 36-6-218(1). Father failed to obtain an order from the Montana court ceding jurisdiction. *See id.* § 36-6-217cmt. (2014) ("A party seeking to modify a custody determination must obtain an order from the original decree State stating that it no longer has jurisdiction."). In the absence of an order from the Montana court, jurisdiction to modify the Montana court's child-custody determination could only be made under the second subsection of the jurisdictional statute.

The second subsection would be applicable only if Aden and both parents "d[id] not presently reside" in Montana. *Id.* § 36-6-218(2); *see also id.* § 36-6-217(a)(2). "[P]resently resides" is not a defined term in the UCCJEA. *See id.* § 36-6-205. When faced with interpreting "presently resides" in this context, we have said "the sole question is whether the relevant individuals 'continue to actually live within the state' or have 'physically le[ft] the state to live elsewhere.'" *Staats*, 206 S.W.3d at 549 (quoting Tenn. Code Ann. § 36-6-217 cmt.). Because jurisdiction attaches at the commencement of a proceeding, the relevant inquiry is where did the parties reside at the time of the filing of the modification petition.

7

*Staats*, 206 S.W.3d. at 548-49; *Highfill v. Moody*, No. W2009-01715-COA-R3-CV, 2010 WL 2075698, at *11 (Tenn. Ct. App. May 25, 2010).

We conclude that the second subsection was also not applicable. Father resided in Montana when he filed his petition to modify the Montana parenting plan. While it is undisputed that Mother, Father, and Aden left Montana around the time of the divorce, Father returned to Montana in November 2013 before he filed his petition to modify. Father did not visit Aden in Tennessee between November 2013 and March 2014 or live in his Spring Hill house. *See Highfill*, 2010 WL 2075698, at *12 (stating focus should be on where party was actually living on relevant date).

Because the circumstances specified by the UCCJEA were not present, the court lacked subject matter jurisdiction to modify the child-custody determination of the Montana court. Accordingly, we vacate those portions of the court's order that modify the parenting schedule. *See Dishmon*, 15 S.W.3d at 480 ("[W]hen an appellate court determines that a trial court lacked subject matter jurisdiction, it must vacate the judgment and dismiss the case without reaching the merits of the appeal.").

Although the trial court lacked subject matter jurisdiction to modify the child-custody determination of the Montana Court, the trial court did have authority to enforce visitation. Under Tennessee Code Annotated § 36-6-228, a Tennessee court "which does not have jurisdiction to modify a child-custody determination may issue a temporary order enforcing . . . [t]he visitation provisions of a child-custody determination of another state that does not provide for a specific visitation schedule." Tenn. Code Ann. § 36-6-228(a)(2). In doing so, the enforcing court may substitute a "specific visitation schedule." *Id.* § 36-6-228 cmt. However, the enforcing court must "specify . . . a period that it considers adequate to allow the petitioner to obtain an order from a court having jurisdiction." *Id.* § 36-6-228(b).

Under the facts of this case, we find it appropriate to treat the parenting schedule proposed by Mother and adopted by the trial court as a temporary schedule. Consequently, a remand is required to permit the trial court to specify a period that it considers adequate to allow Father to obtain an order from the Montana court either modifying the parenting plan or determining that it no longer has exclusive, continuing jurisdiction under UCCJEA or that a Tennessee court would be a more convenient forum. *See id.* § 36-6-218(1). The temporary schedule will remain in effect until such an order is obtained or the period set by the court on remand expires. *Id.* § 36-6-228(b).

2. Jurisdiction to Modify Child Support Established in Montana

The UIFSA "controls the establishment, enforcement, or modification of support orders across state lines." *LeTellier,* 40 S.W.3d at 493. The intent of the statute is to ensure parties are subject to only one valid support order at any one time. The key concept, much

like the UCCJEA, is "continuing exclusive jurisdiction." *Id.*

The UIFSA permits a court of one state to modify child support ordered by another state if the child support order has been registered in the state where the modification is sought and one of two factual circumstances apply. Tenn. Code Ann. § 36-5-2611.[2] Under Tennessee Code Annotated § 36-5-2611,

> (a) After a child support order issued in another state has been registered in this state, the responding tribunal of this state may modify that order only if § 36-5-2613[3] does not apply and after notice and hearing it finds that:
>
> (1) The following requirements are met:
> (A) The child, the individual obligee, and the obligor do not reside in the issuing state;
> (B) A petitioner who is a nonresident of this state seeks modification; and
> (C) The respondent is subject to the personal jurisdiction of the tribunal of this state; or
>
> (2) The child, or a party who is an individual, is subject to the personal jurisdiction of the tribunal of this state and all of the parties who are individuals have filed written consents in the issuing tribunal for a tribunal of this state to modify the support order and assume continuing, exclusive jurisdiction over the order. However, if the issuing state is a foreign jurisdiction that has not enacted a law or established procedures substantially similar to the procedures under parts 20-29 of this chapter, the consent otherwise required of an individual residing in this state is not required for the tribunal to assume jurisdiction to modify

---

[2] The Tennessee General Assembly amended the UIFSA in 2010. *See* 2010 Tenn. Pub. Acts 372 (ch. 901). Initially, the Legislature set the effective date of the 2010 amendments to coincide with federal ratification of the Hague Convention on the International Recovery of Child Support and Other Forms of Family Maintenance. *Id.* at 405. In 2016, the Legislature changed the effective date to "when the department of human services files a notice with the secretary of state . . . citing the effective date, which shall occur no later than April 1, 2016." 2016 1 Tenn. Code Ann. Adv. Legis. Serv. 203 (LexisNexis). The Department of Human Services filed a notice with the Secretary of State citing the effective date as March 31, 2016. Therefore, throughout the opinion, we cite to the version of the UIFSA and Tennessee Code Annotated § 36-5-2611 effective prior to the 2010 amendments.

[3] Tennessee Code Annotated § 36-5-2613 governs situations in which the child and the parents have left the issuing state and all moved to the same state, which is not the case here.

9

the child support order.[4]

*Id.* Mother satisfied the first requirement of the jurisdictional statute by registering the Montana divorce decree in Tennessee, *see id.* §§ 36-5-2605, -2609,[5] so the trial court possessed jurisdiction to modify the Montana child support order if the factual circumstances set forth in either subsection (a)(1) or (2) were present.

The factual circumstance described in subsection (a)(1) was not present. Our inquiry under subsection (a)(1) focuses on where Father resided on the date the petition to modify child support was filed. *Highfill*, 2010 WL 2075698 at *11; *Jordan v. Jordan,* No. W2002-00854-COA-R3-CV, 2003 WL 1092877, at *7 (Tenn. Ct. App. Feb. 19, 2003) ("Therefore, the question is simply this: where was Mr. Jordan residing when this action commenced?"). As discussed above, Father resided in Montana at the time he filed his petition to modify child support. Because the obligor, Father, still resided in the issuing state, Montana, when he filed his petition for modification of child support, the trial court's jurisdiction could only be premised upon subsection (a)(2) of the statute.

Subsection (a)(2) applied if two things were true. First, the child or a party must have been subject to the personal jurisdiction of the trial court, and second, the parties must have filed a written consent with the issuing court to the assumption of continuing, exclusive jurisdiction by the trial court. Tenn. Code Ann. § 36-5-2611(a)(2). In this case, all parties were subject to the personal jurisdiction of the trial court. Both Mother and Aden lived in Williamson County, Tennessee, and Father, by filing his petition in Tennessee, submitted to the jurisdiction of the trial court. *See Dooley v. Dooley*, 980 S.W.2d 369, 372 (Tenn. Ct. App. 1998). Consequently, the trial court possessed jurisdiction to modify the Montana child support order if the parties filed written consents with the Montana court to the trial court assuming continuing, exclusive jurisdiction over the order.

Father submits that the parties did consent in a writing filed with the Montana court. At trial, Father, over Mother's objection, offered a copy of a "Notice of Filing of Agreed Order," which attached the agreed order entered by the trial court on January 10, 2014. As noted above, the agreed order, which registered the Montana divorce decree in Tennessee, provided that the Chancery Court for Williamson County, Tennessee, "shall retain jurisdiction over said matter in all respects." While the copy was not certified, the Notice of

---

[4] Montana has adopted the UIFSA. *See* Mont. Code Ann. § 40-5-1001 (Westlaw through 2015 Legis. Sess.).

[5] The UIFSA recognizes that a child support order may be registered "for enforcement, for modification, or both." Tenn. Code Ann. § 36-5-2611 cmt. In this case, Mother appears to have registered for enforcement while Father registered for modification.

Filing of Agreed Order did bear a "filed" stamp from the Park County[6] Clerk of District Court. Father also testified that the notice and agreed order had been filed in Montana. The trial court found the document bore "the indicia of authenticity" and admitted it as an exhibit.

Mother argues[7] that, because the uncertified copy was not properly authenticated, the trial court erred in admitting the copy. Generally, the admissibility of evidence rests within the discretion of the trial court, and the court's decision to admit evidence will be reversed only upon the showing of abuse of that discretion. *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *Mayo v. Shine*, 392 S.W.3d 61, 65 (Tenn. Ct. App. 2012). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an unreasonable result, or bases its decision on a clearly erroneous assessment of the evidence. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

We find no abuse of discretion in the trial court's admission of the notice of filing as an exhibit. Under our evidentiary rules, a document can be authenticated if the proponent presents "evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). The necessary evidence can be provided by the testimony of a witness with knowledge. Tenn. R. Evid. 901(b). This court has previously approved the admission of court documents as authentic, even when not certified, upon the testimony of a witness with knowledge accompanied by court clerk stamps and other "indicia of reliability." *See State Dep't of Children's Servs. v. J.C.*, No. E2008-00510-COA-R3-PT, 2008 WL 3539736, at *14 (Tenn. Ct. App. Aug. 14, 2008).

In this circumstance, the filing of the Tennessee agreed order with the Montana court satisfied the written consent requirement of subsection (a)(2) of the jurisdictional statute. By consenting to the trial court exercising jurisdiction "in all respects," we conclude that the parties intended for the trial court to assume continuing, exclusive jurisdiction over child support. Therefore, once the agreed order was filed with the issuing court, the trial court had subject matter jurisdiction under the UIFSA to modify the Montana child support order.

### B. MODIFICATION OF MONTANA CHILD SUPPORT

Appellate courts review child support decisions using the deferential abuse of

---

[6] Park and Sweet Grass Counties make up Montana's Sixth Judicial District. *See* Information for General Public – Court Locator, Montana Judicial Branch, http://courts.mt.gov/locator/dist6 (last visited July 17, 2016).

[7] Additionally, Mother argues Father did not comply with the local rules of court before introducing the notice into evidence. We find no abuse of discretion in waiving the local rule in this circumstance, and Mother has not shown a clear miscarriage of justice. *Killinger v. Perry*, 620 S.W.2d 525, 525 (Tenn. Ct. App. 1981).

discretion standard and will refrain from substituting their discretion for that of the trial court. *Richardson v. Spanos,* 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005). "We will not reverse the trial court's decision unless we determine it is clearly unreasonable based on the facts of the case and the applicable law." *Yates v. Yates*, No. M2015-00667-COA-R3-CV, 2016 WL 748561, at *11 (Tenn. Ct. App. Feb. 24, 2016); *see Richardson*, 189 S.W.3d at 725.

Neither party contests the trial court's finding that a significant variance existed between the child support amount ordered in Montana and the child support amount presumed under the Guidelines. *See* Tenn. Code Ann. § 36-5-101(g) (Supp. 2015); Tenn. Comp. R. & Regs. 1240-02-04-.05(2). Once a significant variance has been found, the court must increase or decrease the support order as appropriate under the Guidelines. Tenn. Comp. R. & Regs. 1240-02-04-.05(5). Here, the trial court reduced Father's child support obligation from $2,600 to $2,200 per month.

1. Calculation of Gross Income

The first step in determining child support is setting the parties' gross income. Tenn. Comp. R. & Regs. 1240-02-04.04(3); *see also Milam v. Milam,* No. M2011-00715-COA-R3-CV, 2012 WL 1799029, at *3 (Tenn. Ct. App. May 17, 2012) ("The integrity of a child support award is dependent upon the trial court's accurate determination of both parents' gross income."). Father takes the position that the court should have determined his child support obligation based solely on the income reflected in his tax returns without considering his access to the family trusts or other assets. Father also challenges the trial court's findings that he is voluntarily unemployed and that Mother is not willfully underemployed. Alternatively, Father claims the court erred in its calculation of Mother's gross income based on her 2013 tax return.[8]

We conclude that the trial court appropriately included Father's trust income in its calculation of his gross income. Under the Guidelines, gross income is broadly defined to include all income from any source, whether earned or unearned. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(1); *see Moore v. Moore*, 254 S.W.3d 357, 360 (Tenn. 2007) (holding the broad definition of gross income includes a one-time capital gain); *Ford v. Ford*, No. 02A01-9507-CH-00153, 1996 WL 560258, at *2 (Tenn. Ct. App. Oct. 3, 1996) (holding a parent's withdrawal of trust principal should be included in broad definition of "gross income"). The definition specifically includes trust income. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(1). Under this expansive definition, whether the trust payments were mandatory or discretionary is irrelevant. *See Ford v. Ford*, No. 01A01-9611-CV-00536,

---

[8] Father also argues the trial court erred in refusing to reopen the proof on income after the hearing because he did not receive Mother's 2013 tax return in time to use it at trial. The court, however, admitted the tax return as a late-filed exhibit. Under these facts, we find no abuse of discretion in the trial court's decision.

1998 WL 730201, at *5 (Tenn. Ct. App. Oct. 21, 1998) (stating it did not matter whether the parent's trust income "came from regular inheritance distributions of trust principal, from allowable hardship distributions of trust principal, or from income coming into the trust, as long as funds remain in the trust").

Moreover, we have previously held that "gross income" is not limited to the income shown on a parent's tax return. *See Wade v. Wade*, 115 S.W.3d 917, 922 (Tenn. Ct. App. 2002); *Rogin v. Rogin*, No. W2012-01983-COA-R3-CV, 2013 WL 3486955, at *7 (Tenn. Ct. App. July 10, 2013). Only Father's quarterly trust distributions were reflected on his tax returns as income. Father's income for tax purposes did not include additional trust distributions, such as the $145,000 payment in 2012 and the $105,000 payment in 2013, or the distributions on his behalf for child support, health insurance, and life insurance. We conclude these distributions fall within Tennessee's definition of gross income for child support purposes.

We next consider whether the trial court erred in finding that Father was voluntarily unemployed and that Mother was not willfully underemployed. These determinations are questions of fact that require a careful consideration of all the relevant circumstances. *Reed v. Steadham,* No. E2009-00018-COA-R3-CV, 2009 WL 3295123, at *2 (Tenn. Ct. App. Oct. 14, 2009). The trial court's determination of willful and voluntary underemployment is entitled to substantial deference on appeal "especially when it is premised on the trial court's singular ability to ascertain the credibility of the witnesses." *Owensby v. Davis*, No. M2007-01262-COA-R3-JV, 2008 WL 3069777, at *4 (Tenn. Ct. App. Jul. 31, 2008)); *see Willis v. Willis*, 62 S.W.3d 735, 738 (Tenn. Ct. App. 2001) (stating the trial court has considerable discretion in this determination).

In reviewing the court's findings, we are mindful of the purpose of this determination:

> The Guidelines do not presume that any parent is willfully and/or voluntarily under or unemployed. The purpose of the determination is to ascertain the reasons for the parent's occupational choices, and to assess the reasonableness of these choices in light of the parent's obligation to support his or her child(ren) and to determine whether such choices benefit the children.
>
> A determination of willful and/or voluntary underemployment or unemployment is not limited to choices motivated by an intent to avoid or reduce the payment of child support. The determination may be based on any intentional choice or act that adversely affects a parent's income.

13

Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii)-(ii)(I). "While parents have the right to pursue their own happiness and to make reasonable employment choices, they will not be permitted to avoid their duty to support their children by decreasing their income." *Richardson*, 189 S.W.3d at 726.

The Guidelines direct the court to consider the parent's past and present employment as well as the parent's education, training and ability to work. Tenn. Comp. R. & Regs. 1240-02-04.04(3)(a)(2)(iii). The court may also consider "[a]ny additional factors deemed relevant to the particular circumstances of the case." *Id.* Our courts have accepted a parent's reason for working at a lower paying job if the parent's explanation is reasonable and in good faith. *Willis,* 62 S.W.3d at 738-39. On the other hand, courts "are more inclined to find willful and voluntary underemployment when a decision to accept a lower paying job is voluntary." *Richardson*, 189 S.W.3d at 726. "Accordingly, the courts must scrutinize the reasons for the obligor parent's career decision, and the reasonableness of his or her ultimate career choice." *Scott v. Scott*, No. M1999-00322-COA-R3-CV, 2001 WL 266038, at *3 (Tenn. Ct. App. Mar. 20, 2001) (citations omitted).

We conclude that the trial court followed the Guidelines in making its determination, and we find no basis in this record to set aside the court's findings. Although Father testified that he could not work because he needed a flexible schedule to exercise his parenting time with Aden, the trial court, after considering his employment history and ability to work, found he voluntarily chose not to work. The court also found Father's voluntary choice decreased the income available to support Aden. In addition, the court appropriately based its decision that Mother was not willfully underemployed on Mother's efforts to find full-time employment, her education and training, and her previous work history.

In light of the foregoing, we find no abuse of discretion in the trial court's calculation of Father's gross income as $18,167 on a monthly basis. Father's gross monthly income from his 2013 tax return was $12,325. The trust paid $2,600 for child support and $422 for health insurance for Mother and Aden each month. Moreover, the allocation of an additional $2,917 in imputed income is appropriate in light of Father's education and past employment. *See* Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii)(II).

However, we do find error in the calculation of Mother's gross income as $35,000 in light of the evidence in this record that Mother's income in 2013 was $41,380. The trial court provided no explanation of its calculation of Mother's gross income, and we can only conclude that the court's calculation failed to include all of Mother's sources of income. As discussed above, the Guidelines broadly define gross income to include interest income, dividend income, retirement plan distributions, and net capital gains. *Id.* 1240-02-04-.04(3)(a)(1). Because the additional income evidenced in Mother's 2013 tax return was not reflected in the trial court's calculation, we remand for a redetermination of Mother's gross income in accordance with the Guidelines.

2. Adjustments to Child Support for Additional Expenses

We next consider the trial court's decisions regarding adjustments for additional expenses. The Guidelines require the court to include any additional expenses for the child's health insurance premium, recurring uninsured medical expenses, and work-related child care in determining child support. Tenn. Comp. R. & Regs. 1240-02-04-.04(8). Father challenges the trial court's decisions in all three categories.

Father was required to pay $117 each month to Mother for Aden's health insurance premium. Under the Guidelines, that monthly cost should be credited to the parent paying the premium. *Id.* 1240-02-04-.04(8)(b)(3). In this case, the health insurance premium amount was credited to Mother. Although Mother did make the actual payment to the health insurance company, undisputedly, Father provided the funds.[9] On remand, the court should credit Father for his payment of Aden's health insurance premium as required by the Guidelines.

We find sufficient evidence in the record to support the trial court's finding of $600 in work-related child care expenses. *Id.* 1240-02-04-.04(8)(c)(1). Because her work hours extend into the evening, Mother used a combination of a commercial day care facility and individual sitters to care for Aden. While her child care expenses varied, Mother spent, on average, $691 per month on work related child care. Although Father argues some of Mother's child care was not work related, it appears the court adjusted the allowed amount accordingly.

We also find no abuse of discretion in the trial court's division of Aden's uninsured medical expenses. The Guidelines require these expenses to be divided on a pro rata basis unless some other division is specifically ordered by the court. *Id.* 1240-02-04-.04(8)(d). The court's refusal to order another method of division was reasonable in light of the evidence.

3. Deviations from the Child Support Guidelines

The Guidelines presume a monthly amount of child support based on the parents' combined gross income after allowable adjustments. *Id.* 1240-02-04-.04(11). The trial court has discretion, however, to deviate from the presumptive amount under certain circumstances. *Id.* 1240-02-04-.07(1). In our review, we uphold the court's decision to

---

[9] Mother argues that Father should not receive credit for his payment of the health insurance premium because he has a contractual obligation to pay the premium under the Montana settlement agreement. We find Mother's argument unavailing.

deviate from the presumptive amount "as long as the trial court applied a correct legal standard, the decision is not clearly unreasonable, and reasonable minds can disagree about its correctness." *Reeder v. Reeder*, 375 S.W.3d 268, 275 (Tenn. Ct. App. 2012) (citations omitted). Here, the court ordered an upward deviation in child support of $100 per month. Father contends that the court erred in ordering an upward deviation and refusing to grant a downward deviation for his travel expenses. Mother argues that the court should have awarded an additional upward deviation based on Father's ability to pay.

If a court deviates from the presumptive amount, the court must make written findings of fact stating the amount of child support presumed by the Guidelines, the reason for the deviation, how application of the presumptive amount would be unjust or inappropriate, and how the deviation serves the child's best interest. Tenn. Comp. R. & Regs. 1240-02-04-.07(1)(c). "[I]f the net income of the obligor exceeds ten thousand dollars ($10,000) per month, then the custodial parent must prove, by a preponderance of the evidence, that child support in excess of the amount provided for in the child support guidelines is reasonably necessary to provide for the needs of the minor child . . . ." Tenn. Code Ann. § 36-5-101(e)(1)(B). In making its determination, the court must consider all available income of the obligor and make a specific finding that the deviation is reasonably necessary. *Id.*; Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(g).

After finding application of the Guidelines would result in $2,100 in presumptive child support, the court determined an upward deviation of $100 was reasonably necessary and supported by the facts. The court noted Father's high standard of living and found that not all the funds he received from the trusts were adequately captured in the gross income calculation. Specifically, the court noted Father's receipt of $105,000 in 2013 was not included in his gross income. Therefore, based on the disparate financial positions of Mother and Father and the nature of Father's income, the court determined it would be unjust to apply the presumptive amount of child support in this case.

We conclude that the trial court appropriately exercised its discretion to deviate from the presumptive child support amount under the Guidelines. The court considered both Father's available income and the goals of the Guidelines in its determination that an upward deviation of $100 was reasonably necessary in this case. One of the major goals of the Guidelines is to "[e]nsure that, when parents live separately, the economic impact on the child is minimized, and, to the extent that either parent enjoys a higher standard of living, the child shares in that higher standard." Tenn. Comp. R. & Regs. 1240-02-04-.01(3)(e). Father acknowledged at the hearing that, without his child support payment, Mother's income could not cover her expenses. In light of the showing of need and the fact that not all of Father's trust distributions are included in the calculation of his gross income, we find no abuse of discretion in making an upward deviation or in the amount of the deviation. *See Wiser v. Wiser*, 339 S.W.3d 1, 19-20 (Tenn. Ct. App. 2010) (acknowledging the goal of the Guidelines to "ensure that the children fully share the standard of living enjoyed by the parent

16

with the most financial resources."); *State ex rel. Middleton v. Cochran*, No. E2002-00164-COA-R3-JV, 2002 WL 31059286, at \*5 (Tenn. Ct. App. Sept. 17, 2002) (finding upward deviation appropriate when one parent had substantially higher income than the other); *Cunningham v. Cunningham*, No. W1999-02054-COA-R3-CV, 2000 WL 33191364, at \*7 (Tenn. Ct. App. Oct. 20, 2000) (approving upward deviation in light of goal of the Guidelines to ensure child shares in parent's high standard of living); *but see Atkins v. Motycka*, No. M2007-02260-COA-R3-CV, 2008 WL 4831314, at \*7 (Tenn. Ct. App. Nov. 6, 2008) (holding the need to maintain a lifestyle was an insufficient reason to support an upward deviation that more than doubled the presumptive amount).

With regard to parenting time travel expenses, we find no abuse of discretion in the trial court's refusal to grant Father a downward deviation. The trial court took into consideration all the relevant circumstances, including Father's income and voluntary decision to live in Montana. *See* Tenn. Comp. R. & Regs. 1240-2-4-.07(2)(c); *Long v. Long*, No. M2006-02526-COA-R3-CV, 2008 WL 2649645, at \*12 (Tenn. Ct. App. July 3, 2008) (finding no abuse of discretion when trial court appropriately considered the parent's income and reason for move).

4. Miscellaneous Child Support Issues

Father also argues the trial court erred in refusing to modify the Montana divorce decree with regard to the award of the dependent tax exemption and the requirement that he maintain life insurance to secure his child support obligation. We find no abuse of discretion in the trial court's decision. *See* Tenn. Code Ann. § 36-5-101(i); *Young v. Young*, 971 S.W.2d 386, 392 (Tenn. Ct. App. 1997) (holding "the legislature specifically left the determination of whether to order a party to procure insurance for the benefit of the other party and children of the marriage to the discretion of the trial court"); *Chandler v. Chandler*, No. W2006-00493-COA-R3-CV, 2007 WL 1840818, at \*9 (Tenn. Ct. App. June 28, 2007) ("The decision of a trial court regarding the allocation of exemptions for minor children is discretionary and should rest on facts of the particular case.").

Father also challenges the trial court's refusal to make the reduction in child support retroactive to the date of his modification petition. We leave decisions as to the date on which a new child support amount is effective to the sound discretion of the trial court. *Wiser*, 339 S.W.3d at 20; *Huntley v. Huntley*, 61 S.W.3d 329, 339 (Tenn. Ct. App. 2001). In support of its decision to make the reduction effective as of October 24, 2014, the court found that "the history of this case shows a gradual increase in interest by [Father] in his son over a period of time . . . [and that a] reduction of child support in the amount [Father] suggested would leave [Mother] at an unpredicted financial disadvantage." We find no abuse of discretion by the trial court in this regard.

17

## C. ATTORNEY'S FEES

The trial court awarded Mother $32,000 in attorney's fees for her efforts in defending the child support order. Both parties argue on appeal that the court erred in its award. By statute, the prevailing party in child support proceedings may recover from the other spouse reasonable attorney's fees incurred in that effort. Tenn. Code Ann. § 36-5-103(c) (2014). Awards of attorney's fees under this statutory provision are now "familiar and almost commonplace." *Deas v. Deas,* 774 S.W.2d 167, 170 (Tenn. 1989). Courts grant these awards to "facilitate a child's access to the courts." *Sherrod v. Wix,* 849 S.W.2d 780, 784 (Tenn. Ct. App. 1992).

Mother argues that the court erred in only awarding her a portion of her attorney's fees. We disagree. The amount of attorney's fees awarded must be reasonable, and the fees must relate to custody or support issues. *Miller v. Miller,* 336 S.W.3d 578, 586 (Tenn. Ct. App. 2010). The court refused to award Mother the attorney's fees charged by her previous attorney because Mother failed to submit an itemized statement for those charges. Without the itemization, the court was unable to determine the reasonableness of the fees or whether the fees were related to support issues. We find no abuse of discretion in the trial court's decision.

Father makes several arguments regarding the court's award of attorney's fees. First, he asserts that the trial court erred in allowing Mother to submit the affidavits from her attorneys because she did not comply with local rules of court. We find no abuse of discretion in the trial court's decision to waive the local rules in this instance. Next, he challenges the trial court's refusal to allow him to attack the reasonableness of Mother's requested attorney's fees after the close of the hearing. Because Father failed to object to the reasonableness of the attorney's fees during the hearing, we deem this issue waived. Tenn. R. App. P. 36(a).

Finally, Father argues he was the prevailing party; therefore, he should have been awarded attorney's fees, not Mother. We again disagree. Father asked the court to reduce child support from $2,600 to $1,300. We conclude Mother's efforts benefited the child and the award of attorney's fees was appropriate under the statute. *See Evans v. Evans*, No. M2002-02947-COA-R3-CV, 2004 WL 1882586, at *12 (Tenn. Ct. App. Aug. 23, 2004) (stating the general rule that the award of fees "is for the benefit of the child and is a necessary part of, or inseparable from, the child's right to support"); *Sherrod*, 849 S.W.2d at 785 ("requiring parents who precipitate custody or support proceedings to underwrite the costs if their claims are ultimately found to be unwarranted is appropriate as a matter of policy.").

18

## D. ATTORNEY'S FEES ON APPEAL

Mother requests an award of her attorney's fees on appeal. Under Tennessee Code Annotated § 36-5-103(c), we have discretion to award a prevailing party fees incurred on appeal. *Pippin v. Pippin,* 277 S.W.3d 398, 407 (Tenn. Ct. App. 2008); *Shofner v. Shofner,* 181 S.W.3d 703, 719 (Tenn. Ct. App. 2004). We consider the following factors in our decision to award fees: (1) the requesting party's ability to pay the accrued fees; (2) the requesting party's success in the appeal; (3) whether the requesting party sought the appeal in good faith; and (4) any other relevant equitable factors. *Hill v. Hill,* No. M2006-02753-COA-R3-CV, 2007 WL 4404097, at *6 (Tenn. Ct. App. Dec. 17, 2007). Considering these factors, we award Mother her attorney's fees incurred on appeal. On remand, the trial court should determine the proper amount of attorney's fees to be awarded to Mother.

## III. CONCLUSION

Because the trial court lacked subject matter jurisdiction to modify the Montana child custody determination, we vacate that portion of the court's order that modified the Montana parenting plan and remand with instructions to dismiss the Father's petition to the extent it seeks modification of parenting time. We affirm the parenting schedule adopted by the trial court as a temporary order enforcing the visitation provisions of the Montana parenting plan and remand for the trial court to specify a time period for Father to obtain an appropriate order from the Montana court. We also vacate the court's child support determination and remand to the trial court for the purpose of calculating Mother's gross income in accordance with the Guidelines and this opinion. On remand, the court should also credit Father for his payment of the child's health insurance premium. Finally, we direct the trial court to determine the proper amount of attorney's fees to be awarded to Mother for this appeal.

_____
W. NEAL MCBRAYER, JUDGE

19